BURKS, J.,
delivered the opinion of the court.
Before proceeding to the consideration of this case on its merits, several preliminary matters must be disposed of.
1. The exception to the deposition of Mrs. Lilienfeld on the ground of her alleged incompetency as a witness.
The rule at common law that husband and wife are not allowed to testify either for or against each other is not altered, but expressly retained by our statute removing the disqualification of witnesses on account of interest. Code of 1873, ch. §§ 22.
But Mrs. Lilienfeld did not dispose for her husband, nor against *him. She disposed wholly in her own behalf, and her evidence does not, and cannot effect him. It is true, he is a party to the suit, but f.or the sake of conformity merely. The sole object of the bill is to reach her separate estate. He has no legal interest in the subject matter. No relief is sought, nor could any decree be rendered against him in the cause. He does not dispute his personal liability on the note in controversy, and the remedy at law as to him is complete. The exception must be overruled.
2. It follows, that the- exception to the depositions of the complainants, Frank & Adler, must' also be overruled, as they are not incompetent to testify unless Mrs. Lilienfeld be so.
3. The counsel of Mrs. Lilienfeld claims that the answer of her husband to the bill is responsive, and therefore evidence for her against the complainants.
The refutation of this pretention is furnished by the facts already stated. The husband, although made a party for the sake of conformity, has no legal interest in the cause, and no discovery from him nor relief against him is asked; nor upon the case stated in the pleadings and made by the proofs could any personal decree be rendered against him. Besides, the interest of the wife is adverse to her husband. They filed separate answers, and the separate answer of one defendant cannot be used as evidence in the cause either for or against a co-defendant. Such is the general rule. There are some exceptions in cases of joint interest, privity, and the like, but this case does not fall within any of those exceptions. On the contrary, the relation of the parties, (that of husband and wife), with an adverse interest in the wife, would seem to render the application of the general rule peculiarly proper. Whether a bill against several defendants, having no interest in common, and without privity of *any sort, may not be so framed, in relation to the discovery and relief prayed, as to render the answer of one defendant, which is responsive to the bill and unfavorable to the complainant, evidence against the latter in favor of a co-defendant, is a question not presented by the case we now have to deal with, and- therefore need not be determined. 3 Greenleaf’s Ev., § 283 and notes; 1 Dan. Ch. Prac. (4th Perk. Ed.), 841 note 7; Id. 843, note 7; Pettit v. Jennings and others, 2 Rob. R. (Va.) 676; Morriss v. Nixon, 1 How. U. S. R. 118, 126, 127.
While the husband’s answer is without any weight as proof in the cause, the answer of the wife is admissible as evidence in her own behalf and against the complainants, so far as its statements are responsive to the bill and based on facts within her own knowledge. Clark’s ex’or v. Van Riemsdyk, 9 Cranch R. 153, 160, 161.
From the pleadings and proofs in the record, we have substantially the following case:
Lilienfeld (the husband), proposed to purchase from one Bloomberg, a merchant in Richmond, a lot of goods, and to secure the payment of the price, his wife, who had a separate estate, agreed to endorse her husband’s note to be delivered to Bloomberg. She says, that her husband represented to her, that the amount of the purchase was some forty or fifty dollars. According to the testimony of other witnesses the actual amount was much larger. But whatever the amount was supposed to be, she endorsed in blank and delivered to her husband for the purpose aforesaid, a printed form of a note with blanks left on the face for date, time and place of payment, amount, and name of payee, and without the signature, it seems, at that time of her husband as maker. The printed part would seem to indicate, that the note was intended to be negotiable.
*The blank for the name of the payee was followed by the words “or order without offset - dollars negotiable and payable,” &c. Lilienfeld did not consummate the purchase of the goods from Bloomberg, and therefore did not use the note for the intended purpose. He kept it, and his wife says, she thought it had been destroyed. Some months afterwards, (the precise time is not disclosed by the record), Lilienfeld, who, it seems, was merchandizing at Weldon, North Carolina, went to Baltimore to *477 purchase goods. He bought goods of the complainants and of another firm to the amount, in the aggregate, of $638.66, for which he gave to the complainants the note which had been endorsed by his wife as before stated, (which is the note in controversy in this case), they assuming payment to the other firm of the price of the goods bought of said firm. He signed the note as maker at the time it was delivered to the complainants, and their bookkeeper filled up the blanks. Completed the note is of the tenor following:
“Baltimore, Sept. 17th, 1875.
“$628.66-100.
“Pour months after date. I promise to pay to Prank & Adler, or order, •without offset, six hundred and twenty-eight 66-100 dollars negotiable and payable at Planters National Bank, Richmond, Va., value received. No. 1,464. Due Jan’y 17-30, ’76.
“S. B. Lilienfeld.”
Endorsed:
“Janette Lilienfeld, “Frank & Adler.”
I have underscored (to be italicized) such of the words as were in the printed form. In filling up, the Sprinted language was left as printed,' unaltered in any way.
After the note had been thus completed and delivered to the complainants, they deposited it for collection in the bank at Richmond where it was payable. Mrs. Lilienfeld-being a resident of that city. Not being paid at maturity, it was duly protested and notice of the dishonor given to the drawer and endorser.
There is evidence tending to show, that some two weeks after the note was protested, it was presented to Mrs. Lilienfeld in Baltimore by a clerk of the complainants, and that she promised to see to its payment after she returned home; but on this point the evidence is conflicting. Pacts omitted in the statement already made will be noticed, as far as deemed material, in the proper connection, as this opinion proceeds.
The bill of the complainants was filed to subject the separate estate of Mrs. Lilien-feld to the payment of the note which has been described, and the case is here on an appeal allowed the complainants from a decree of the chancellor dismissing the bill at the hearing.
The correctness of the decree will be best tested by considering the several grounds on which it is attempted by the appellees to be supported, and the claim of the appellants to relief is resisted.
1. It is contended on behalf of Mrs. Lilien-feld, that the negotiation and transfer to the complainants of the uncompleted note endorsed by her in blank and delivered to her husband for a special purpose, passed no title-to the complainants as against her, and conferred upon them no authority to complete the note so as to make it binding upon her or her estate; and that this is so, whether the complainants had notice or not, at the time of the transfer to them, of the purpose for which the note was endorsed. But it is further contended, ’That they did have such notice, and therefore were guilty of bad faith in the transaction.
The law is too well settled, adversely to the first branch of the proposition contended for, to admit of dispute. The following summary of the general principles applicable in such cases, is taken from Mr. Daniel’s valuable Treatise on Negotiable Instruments: “Parties,” says the author, “often lend their mercantile credit to others by signing their names to blank papers to be afterwards filled ás bills of exchange or promissory notes written over their signatures as drawers or makers; or by signing their names in the appropriate manner to indicate that they design to bind themselves as acceptors or indorsers of the instrument which it is contemplated to complete upon such blank papers. And it is a settled principle of commercial law, that when such instruments are afterward completed by the holder of such blanks, to whom they are loaned, such parties become as absolutely bound as if they had signed them after their terms were written out; and further, that the presence of their names upon blanks purports an authority granted to the holder to fill them for any sum, and with any terms as to time, place and conditions of payment. And that although the party may prescribe limits to the holder, a bona fide transferee from him, ignorant of such limitation of authority, when he takes an instrument which has exceeded it, may recover upon it.” 1 Daniel on Neg. Ins. (2d Ed.), § 143.
“The authority implied by a signature to a blank, and the credit granted, are so extensive, that the party so signing will be bound, though the holder was only authorized to use it for one purpose and has perverted it to another.” Id. § 1443; see also § 843.
The supreme court of the United States, speaking through Mr. Justice Clifford, in Bank of Pittsburgh v. *Neal & others, 32 How. U. S. R. 96, 108, “where a party to a negotiable note intrusts it to the custody of another with blanks not filled up,whether it be for the purpose to accommodate the person to whom it was intrusted, or to be used for his own benefit, such negotiable instrument carries on its face an implied authority to fill up the blanks and perfect the instrument; and as between such party and innocent third parties, the person to whom it was intrusted must be deemed the agent of the party who committed such instrument to his custody — or, in other words, it is the act of the principal, and he is bound by it.” The same was said substantially by the same justice in Goodman v. Simonds, 30 How. U. S. R. 343, 361, and repeated in part in Angle v. N. W. Mutual Life Ins. Co., 92 U. S. (2 Otto). 331, with this addition: “But the authority implied from the existence of the blanks would not authorize the person intrusted with the instrument to vary or alter the material terms of the instrument by erasing what is written or printed as part of the same, nor to pervert the scope and meaning of _ the same by filling the blanks with stipulations repugnant to what was plainly and clearly expressed in the instrument before it was so delivered.”
In Orrick v. Colston, 7 Gratt. 189, it was *478 said by Judge Daniel- (in whose opinion the other judges concurred), “It is well settled that a blank endorsement on a negotiable instrument, blank as to date or amount at the time of the endorsement, if made for the purpose of giving a credit to the drawer,- is as effectual to bind the endorser for any amount with which the instrument may be filled up by the drawer, or an innocent holder for value, as if the instrument had been completed at the time of the endorsement.”
In that case, a paper entirely blank on its face except as to the signatures of Star-buck & Forman, was *endorsed in blank by Colston and delivered to Starbuck for the purpose, it would seem, of renewing a note in bank, of which Starbuck & Forman were the makers and on which Colston was accommodation endorser. Starbuck fraudulently used this paper to effect a loan of money from Orrick, who, ignorant of the purpose for which the endorsement was made, took the paper in its incompleted state and advanced his money on the faith of it. He wrote a non-negotiable promissory note on the face of the paper over the signatures of Starbuck & Forman for the money advanced payable to himself and a guaranty for its payment on the back of the paper over the signature of Colston. It was held, that he had implied authority to do this, and was entitled to recover of Colston the amount of the note, treating him, at his option, either as joint maker or guarantor.
- The principle on which the endorser of blank commercial paper is held liable was clearly and succinctly expressed by Lord Mansfield about a century ago in Russell v. Langstaffe, 2 Doug. R. 514, and is the basis of later adjudications on the same subject. The case is stated by Daniel, 1 Neg. Ins., § 142. A party had endorsed his name on five copper-plate checks, blank as to sums, dates, and times of payment, and Galley, the holder, filled them up as his own notes with different dates, sums, and times of payment. The endorser was held bound to the plaintiff who had discounted them; and Lord Mansfield said, "The endorsement on a blank note is a letter of credit for an indefinite sum. The defendant said. ‘Trust Galley to any amount, and I will be his security.’ It does not lie in his mouth to say the endorsements were not regular.”
In the case under consideration, the note at the time it was ordered was blank not only as to sums, date and time of payment, but also as to payee. The endorsement *was therefore in the nature of a general ter of credit addressed to any person who would give credit to the drawer for any amount. In legal effect, it was a proposition of the endorser to become bound as security for the payment of whatever sum should be advanced or credited to the drawer by any person whatsoever. When, therefore, _ the complainants gave the credit, the proposition was thereby accepted, and the contract between them and the endorser was complete.
It may be, and, if Mrs. LiMenfeld’s statement is accepted as t'rue, it is proved, that in this transaction her husband basely deceived and defrauded her. But if the complainants are innocent, who should bear the consequences of 'the fraud?
The answer is furnished by the familiar maxim, of general application, and as sound in morals as it is in law, that wherever one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it. Ashhurst, J., in Lickbarrow & another w. Mason & others, 2 T. R. 63, 70.
Mrs. Lilienfeld trusted her husband and put it in his power to defraud her, and to mislead the complainants. She entrusted him with a paper, bearing her engagement, for his own use and accommodation, which had the force and effect of a general letter of credit, and when acted on as such by the complainants, it can avail her nothing to say, that the authority implied by her endorsement was limited by the agreement between herself and her husband, unless the complainants had notice or knowledge of such agreement at the time the paper was transferred to them. In other words, she cannot be relieved of the consequences of her husband’s fraud, unless it is shown that the complainants participated *in that fraud; and it is insisted, that they did so participate.
It has been shown, that the answer of Lilienfeld (the husband) cannot be read as evidence in the cause. But if it could be so used, it is entitled, in my judgment, to but little weight. He shamelessly avows his own fraud in the transaction, but seeks to palliate it by the pretence that he was induced to negotiate the note to the complainants by their solicitations after they had'been apprised by him of its origin and his lack of authority to make a valid transfer of it to them. This is a very improbable story. Its credibility is not strengthened by the history he gives of the note in question. The impression is sought to be made, that after he had failed in the use of the note with Bloomberg he thought it had been destroyed; for he says, “it was intended to be destroyed and he has no doubt his wife thought it was destroyed.” According to his account, after he had purchased the goods of the complainants at their store in Baltimore, they desired him to give a note with an endorser, to which he replied he could not give any. They then stated, that they understood he had real estate in Richmond; to which he answered he had none, but that his wife owned some held by her trustee. “While this interview was going on” (in the language of the answer), “this respondent'had occasion, in the counting-room of the complainants, to examine some papers which he had with him in his wallet, and among them, he found the note endorsed by his said wife in blank, above referred to, though he was not aware that he had said note at the time he went to the store of said complainants.” It was this sudden but seasonable discovery in the “wallet” of the note theretofore “intended to be destroyed.” that enabled him, by the persuasion of the complainants, to perpetrate upon his wife a fraud never before ^contemplated! Such an answer might *479 serve to cast discredit on the respondent, but could not be safely relied on for any other purpose.
On the other hand, the complainant Adler, who sold the goods, in his testimony details the negotiation and explains the whole transaction, so far as the complainants were concerned, in which it does not appear that he or they had any notice or knowledge of the alleged special purpose for which the endorsement was made, or that there was any want of good faith on their part. Uilienfeld was introduced to the complainants by his brother-in-law and by him recommended for credit, which was refused. He then offered the note with his wife’s endorsement as security, representing that fearing he could not buy goods on credit without giving security, he had procured his wife to endorse the blank note, so that he might buy goods and fill up the note with the amount of the purchase. Upon inquiries made of others likely to know, the complainants were informed that Mrs. Uilienfeld had a separate estate, was wealthy, and her endorsement would be sufficient security for any amount of goods sold to her husband. Upon the information thus obtained and the representations aforesaid, the goods were sold and the note was taken as security for payment. The possession by the husband of a note partly blank with his wife’s endorsement in blank was no indication to the complainants of a fraudulent purpose on his part. Such a circumstance was not unusual in mercantile transactions; and besides, his siatement was plausible and had the semblance of truth. After some fluctuation in judicial decisions, English and American, the law seems now to be quite well settled, that to invalidate the title of the holder of a negotiable instrument (not absolutely void by statute law), endorsed in blank, and acquired for value, in due course of trade, and before maturity, *it is not sufficient to show circumstances in the acquisition of the note affecting such holder with suspicion merely, or that he was guilty of ordinary negligence, or even gross negligence (the omission of that care which even the most inattentive and thoughtless men never fail to take of their own concerns), but it is necessary to show that he was guilty of mala fides — in plain language, of fraud. The cases are referred to in the latest works on commercial law. 1 Parsons’ Notes and Bills 258 et seq.; 2 do. 269-279; 1 Daniel on Neg. Inst., ch. 24. See especially Goodman v. Harvey, 4 Ad. & El. 870; Collins v. Gilbert, 94 U. S. (4 Otto) 753 and numerous cases cited in the opinion of the court by Mr. Justice Clifford.
The evidence falls very far short of establishing mala fides or fraud, that is, on the part of the complainants, however gross may have been the fraud of Uilienfeld (the husband), in which they did not participate, and of whose fraudulent purpose they had no notice at the time they acquired the note from him.
2. It is further contended, that if the complainants acquired a good title to the note by the transfer, yet, by inserting their names as payees, they placed Mrs. Uilien-feld in the relation of second endorser to them, and thus rendered her endorsement previously made unavailing as a security, so far as they are concerned.
It seems to me, that this contention goes rather to the form than to the substance of the transaction, and is founded on a misconception of the true relation to each other of the parties to the note.
As has been seen, the endorsement in blank by Mrs. Uilienfeld of the incompleted note, entrusted to her husband for his use and accommodation, was, in legal effect, a proposition on her part to bind herself or her estate as security for the payment of whatever sum should be advanced or credited to her husband by any ^person whomsoever, and when the complainants, on faith of the endorsement, gave the credit and took the note, the proposition was accepted, and the contract between the parties complete, with authority in the complainants to give effect to it by filling the blanks. Her undertaking was that of surety, either absolutely bound as joint maker, or conditionally as guarantor or endorser in a commercial sense. If the paper, when it was delivered to the complainants, had been entirely blank, except as to the signatures, the complainants, according to the decision in Orrickw. Colston, supra, would have been authorized to write over the signature of Uilienfeld (the husband) a promissory note for the price of the goods sold to him, payable to themselves and either negotiable or non-negotiable, at their option. If made non-negotiable, they would have had the right, according to the case referred to, to treat Mrs. Uilienfeld either as a joint maker of the note or as a guarantor. If made negotiable (with themselvesaspayees), upon the principles of the same case, it is not clear that the rights and liabilities of the parties inter se would not have been the same as if the note had been non-negotiable.
But in the case before us, the paper, at the time it was endorsed, was not wholly blank (except as to signatures), as in the case of Orrick v. Colston, but it was an incomplete note. There is no doubt that when Mrs. Uilienfeld wrote her name across the back of it she intended her signature to represent an endorser in a commercial sense. She says, she “endorsed a negotiable note.” And I incline to think that the paper, before it was perfected as a note, had enough upon it to apprise the complainants of the character of' the endorsement. The signature was in the place appropriate for the endorser of a negotiable instrument, and the paper itself was the printed formula in common *use. of a negotiable note, with the blanks before mentioned. It was proper, therefore, if not indispensable, to bind Mrs. Uilienfeld, that the blanks should be filled so as to preserve the negotiability of the note. They were so filled, but instead of inserting the name of Mrs. Uilienfeld as payee, which might and should have been done, so as to make the note conform to her endorsement and show on its face the true- *480 relation of the parties, the book-keeper of the complainants, who filled, the blanks, from inadvertence, mistake or ignorance, inserted the names of the complainants as payees. It would be a great defect in the law if an endorser were allowed to escape a just responsibility by reason merely of such an irregularity as this. But there is no such defect. If Mrs. Lilienfeld had gone in person to the complainants and said to them, “Let my husband have goods and I will endorse his note to you for the amount,” and the goods have been furnished, and such a note, with like endorsement as in the present case, had been given and then filled up, as the note in controversy was, there is no doubt that the complainants could have maintained an action at law against her, on her endorsement, under the strictest rules of pleading, if she were liable, as one sui juris, to a personal action. The case supposed is the case we have, except that Mrs. Lilienfeld did not contract in person, but through her husband rs her agent, by whose acts she is as much bound as if she had contracted in proper person. Moore v. Cross, 19 New York, R. 327, is an authority in point. Moore agreed tosellcoaltoMcGerveyfor his note endorsed by Cross. The sale took place, and the coal and the note endorsed in blank by Cross were respectively delivered. Moore, the payee of the note, brought his action against Cross as endorser, and demand and notice being proved, he was allowed to recover on the facts stated. It seems *that there was no formal endorsement of the note by Moore- In delivering the opinion of the court Johnson, Ch. J. said. “In Moore’s hands the blank endorsement of Cross could have been rendered entirely conformable to the real agreement and object of the parties bv Moore’s making'his own endorsement without recourse in terms. Upon such an endorsement the paper would no longer have afforded a prima facie answer to Moore’s action against Cross; nor could Cross have maintained that such an indorsement was unwarranted, as it would have exactly carried out the intention of the parties. Between these parties I can see no reason why the endorsement might not thus have been made at the trial, or why it may not now. being a mere matter of form and the right to make it being proved, be treated as made.”
To the same effect is the English case of Morriss v. Walker, 69 Eng. C. L. 588, (decided by Queen’s Bench in 1850). The action was on a negotiable note by the holder, who was the first endorser, against the second endorser. It was decided that the action was maintainable on the facts stated in the pleadings, and that the proper form of pleading in such a case is for the plaintiff to declare on the endorsement by him to the defendant as “without consideration.”
When Mrs. Lilienfeld wrote her name across the back of the note in question, there was no other name upon it, and, it is clear, she intended to occupy the relation of first endorser; and that relation, though changed in form, was not changed in substance and in fact by the manner in which the blanks in the note were filled. The difficulty presented is one of the merest technicality, and ought not to avail in a court of law, certainly not in a court of equity, which always looks to substance rather than form. *3. Lastly, it is insisted that if all other objections fail, still the separate estate of Mrs. Lilienfeld is not bound by her endorsement, because she had no power thus to bind it; and if she had, she never intended to render her estate liable for the debt of the complainants.
When it is once determined, that a married woman has a separate estate, it results as matter of law, that she has to the fullest extent the incidental power to make it liable for her debts, if she will, unless such power is denied, or limited, or in some way qualified, expressly or impliedly, by the instrument creating the estate. The power to bind the estate for debts is incident to the jus disponendi.
There is no express denial, limitation, or qualification of this power by the deed of settlement in the present case. If it exists at all, it must arise by implication only. The property settled belonged exclusively to the wife, and was both real and personal estate, consisting of several lots in the city of Richmond, the wife’s interest in her former husband’s estate, debts due her, and furniture and a stock of goods on hand estimated as worth about ten thousand dollars. Provisions of the deed, conferring upon the wife in express terms the amplest power over the whole property, are followed by a clause, which, it is claimed, is restrictive in its operation upon the preceding clauses, and limits the wife’s power of alienation, and consequently her power of binding the estate for debts to the mode of disposition prescribed by that clause, which provides, that the trustee “shall sell, convey, transfer and deliver all or any portion of the property, estate or effects conveyed (by the deed), and the rents, issues, and profits thereof, to such person or persons as (the wife) may direct by a writing signed by her and attested by two witnesses, to take effect during her life; or by a writing, *in the nature of a last will and testament, to take effect at her death.”
The applicability of the maxim, expressio unius 'est exclusio alterius, in the determination of questions arising upon the construction of marriage settlements, as to the mode to be observed by the wife in the disposition of the property settled to her use, has led to much discussion and a great contrariety of decision in the courts. It seems to have been applied by this court in Williamson v. Beckham, 8 Leigh 30, and rejected in Lee v. Bank of the United States, 9 Leigh 200, and in Woodson v. Perkins, 5 Gratt. 345; and in subsequent cases, the question whether, where the instrument creating- the separate estate prescribes a mode of disposing of it, the prer scribing of that mode, without negative words, should be construed as intended to exclude any other, on the principle of the foregoing maxim, has been adverted to as *481 siill an unsettled question in this State. See Nixon v. Rose, trustee. 13 Gratt. 435, 431, 432; McChesney & als. v. Brown’s heirs, 25 Gratt. 393, 401; Justice v. English, 30 Gratt. 565. 571. The determination of the question in each particular case, however, is. at last, one of construction, and while the maxim referred to is of general utility, yet, as has been remarked, great caution is requisite in dealing with it; for, as Lord Campbell observed in Saunders v. Evans, 8 H. L. Cases 720, 729, “it is not of universal application, but depends on the intention of the party as discernable upon the face of the instrument or of the transaction.” Broom’s Leg. Max. 653 (marg.).
Manifestly, the maxim has no just application to the case in judgment. It will be perceived from an examination of the deed, that a large portion of the property conveyed consisted of a stock of goods valued at $10,000. This was probably the most valuable part of the property settled; though it does not appear what *was the value of the other property. The intention is plainly indicated on the face of the deed to “carry on” the business of merchandising, which implies daily sales of goods, and to purchase other goods with the proceeds “or with any property, estate, effects or proceeds thereof conveyed by the deed.” Now, it would seem impracticable, if not absurd, to require these sales of goods to be made in the mode specified for the sale and conveyance of the property covered by the deed. I think therefore the clause in question, considered with reference to other parts of the deed and the nature of the property, was intended to enlarge the powers of the wife so as to enable her by her sole act to dispose of the corpus of her real estate, which she could not otherwise alien except by the joint deed of herself and her husband, and that it was not intended to restrain or to limit the general power of disposition which she retained over her personal estate and the rents, issues, and profits of the real estate. Such was the construction of a similar clause in the deed (in most respects like this) in Woodson, trustee, v. Perkins, supra.
So, Mrs. Lilienfeld must be regarded in equity as the owner of an absolute interest in the property under the deed of settlement, with all the powers of a feme sole as to the personal estate and the rents, issues, and profits of the real estate, and with the power to make disposition of the corpus of the real estate by her sole act in the mode prescribed by the deed, or, if that is not exclusive, by the joint deed of herself and her husband.
With such rights and powers, it cannot be doubted, she may make her separate estate liable for her engagements, if she will. To create a specific lien on her real estate, by way of mortgage or deed of trust, the same mode of conveyance would be requisite as in case of *the absolute sale of such estate. But her general engagements, made with reference to her separate estate, while they would notb-ind her personally nor constitute liens on the estate, in a strict sense, would nevertheless create a liability of a general character which a court of equity would enforce. _ According to the view of Lord Thurlow in the leading case of Hulme v. Tenant, 1 Bro. C. C. 18, as interpreted by Lord Cottenham in Owens v. Dickenson. Cr. & Ph. R. 48, 53, “the separate property of a married woman being a creature of equity,, it follows, that if she has power to deal with it, she has the other power incident to property in general — namely, the power of creating debts to be paid out of it; and inasmuch as her creditors have not the means at law of compelling payment of those debts, a court of equity takes upon itself to give effect to them, not as personal liabilities, but by laying hold of the separate property, as the only means by which they can be satisfied.” 1 Lead. Cas. Eq. (4th Ed.), Part 2, side p. 500.
But the contract of the wife does not per se and of necessity create such a liability. To give it that operation, it is necessary that it should be entered into with reference to and on the credit of the separate estate. There must be an intention to make the estate liable. It need not, however, be express. It may be implied. It is implied when the wife executes a bond, note, or other instrument for the payment of money, either as principal, or as surety for another, even for her husband, no undue influence being used. Tt has been repeatedly so decided by this court. Burnett & wife v. Hawpe’s ex’or, 25 Gratt. 481; Darnall & wife v. Smith’s adm’r & others, 26 Gratt. 878; Garland v. Pamplin & others. 4 Va. Law Journal 99, 33 Gratt. 305.
The endorsement of a bill or note falls within the same ’'’principle. McHenry v. Davies, 6 L. R. Eq. 596; 10 L. R. Eq. 88 (1 Lead Cas. Eq., Part 2, 496, side p.).
It is admitted, that Mrs. Lilienfeld endorsed the note in question, and it is clear that she intended thereby to charge her separate estate; but it is said, that she did not intent to bind her estate for the payment of the debt of the complainants, but a different debt to another person and of a smaller amount. Yet, it remains, that by her endorsement in blank of the note in controversy put into her husband’s hands for use. she represented to the complainants that her estate should be bound for the payment of whatever sum they might advance to her husband or give him credit for, and the complainants, relying on that representation, and ignorant of any limitation upon the husband’s authority, were induced thereby to part with their goods to the husband for the amount specified in the note. In the face of these facts, Mrs. Lilienfeld cannot now be allowed, as against the complainants, to say that her intention was different from what by her acts and conduct she represented it to them to be.
I am of opinion, therefore, that the separate estate is liable for the amount of the note, and that the cause should be remanded with instructions to the chancellor to subject said estate accordingly.
But as the bill prays, that the real estate may be sold to pay the complainants’ debt, to prevent misapprehension, it is proper to state more explicitly to what extent the sepa *482 rate estate may be subjected to meet the wife’s general engagements. The rule, which seems to be the established-doctrine of the English chancery, is thus laid down by Lord Thurlow in Hulme v. Tenant: “Determined cases” says his lordship, “seem to go thus far, that the gener&l engagement of the wife shall operate upon her personal property. shall apply to the rents and profits of her real estate, and that *her trustees shall be obliged to apply personal estate and rents and profits when they arise, to the satisfaction of such general engagement; but this court has not used any direct process against the separate estate of the wife; and the manner of coming at the separate property of the wife has been by decree to bind the trustees as to personal estate in their hands, or rent’s and profits, according to the exigency of justice, or the engagement of the wife, to be carried into execution. * * * I know of no case where the general engagement has been carried to the extent of decreeing that the trustees of her real estate shall make conveyance of that real estate, and by sale, mortgage or otherwise, raise the money to satisfy that general engagement on the part of the wife.” 1 Lead. Cas. Eq., Part 2, side page, 509.
In the United States adjudged cases, following the analogies of the law which authorizes a compulsory sale of real estate for the payment of debts generally, go to the length of ordering such sale to satisfy the debt, if a sale be necessary for such satisfaction. See. cases referred to in 1 Lead. Cas. Eq. (4th Ed.) Part 2, 752, top page.
I think the English rule, as stated by Lord Thurlow, is substantially correct, and therefore to satisfy a general engagement of the wife (and by general engagement I here mean an engagement made with reference to her separate estate, so as to make it liable in a general sense, but which does not amount toaspecific lien of anysortupon such estate), the personal property, where the interest of the wife is absolute and there is no restraint upon the alienation of such property imposed by the instrument creating the separate estate, may be sold by decree of the court, and, under like conditions, the rents and profits of the separate real property may be subjected; and to that end, following the analogy of the law so far, such real estate *may be leased from time to time, by order of the court, until the debt out of the rents be discharged; but in no case. I think, should the real estate or any part thereof be sold by decree to satisfy the debt of the wife unless such debt be one secured by specific lien on such estate, created in a mode which conforms to the mode required for a valid disposition by her of that estate. If the creditor desires to bind the real estate in such a way as shall authorize the sale of it for the satisfaction of his debt, let him take the appropriate security within the power of the wife to give. If he fails to do this,- equity cannot provide him a security which he has neglected to provide for himself. These principles will be observed by the Chancellor in the further proceedings to be taken in the cause.
The decree was as follows:
This cause,which is pending in this court at its place of session at Richmond, having been heard but not determined at said place of session,' this day came here the parties by their counsel, and the court, having maturely considered the transcript of the record of the decree aforesaid and the arguments of counsel, is of opinion, for reasons stated in writing and filed with the record, that the appel-lee, Janette Lilienfeld, by her endorsement of the negotiable promissory note in the bill and proceedings mentioned, made her separate personal estate and the rents and profits of her separate real estate (the same separate estate described in exhibit “B,” filed with the bill in this cause), liable in equity to the appellants for the payment of the sum of money in said note specified, with interest thereon to be computed from the time the said sum became payable according to the tenor of said note until payment, and the costs and charges of the test of said note; and *that the said chancery court should have proceeded to subject the said personal estate, and the rents and profits (but not the corpus) of the said real estate, so far as may be necessary, to the payment of the said sum, interest, cost and charges; and consequently, that the said decree of the chancery court, dismissing the said bill, is erroneous: therefore, it is decreed and ordered, that the said decree be reversed and annulled, and that the appellants recover their costs by them expended in the prosecution of the appeal aforesaid here, to be levied of the separate personal estate and the rents and profits of the separate real estate of the appellee, the said Janette Lilienfeld: and this cause is remanded to the said chancery court for further proceedings to be had therein, in order to final decree, in conformity with the opinioij hereinbefore expressed.
And it is further ordered, that this decree be entered by the clerk of this court on the order book here and forthwith certified to the clerk of this court at its place of session at Richmond and entered by him on the order book there and certified, to the clerk of the chancery court of the city of Richmond.
Decree reversed.